KRISTIN K. MAYES
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

NICHOLAS KLINGERMAN (STATE BAR NO. 028231)
KRISTA WOOD (STATE BAR NO. 025503)
CASEY D. BALL (STATE BAR NO. 034987)
ASSISTANT ATTORNEYS GENERAL
2005 N. CENTRAL AVENUE
PHOENIX, ARIZONA, 85004
TELEPHONE: (602) 542-4686
CRMFRAUD@AZAG.GOV
CADOCKET@AZAG.GOV

ATTORNEYS FOR THE STATE OF ARIZONA

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| State of Arizona, <br>     Plaintiff, <br><br> -vs- <br><br> Mark Meadows, <br>     Defendant. | CV-24-02063-PHX-JJT <br><br> **Response to Mark Meadows's Notice of Removal of Criminal Prosecution Pursuant to 28 U.S.C. §§ 1442 and 1455 and Request for Leave to File Notice Based on Good Cause** |

The State of Arizona, pursuant to this Court's order of August 14, 2024, responds to Defendant Mark Meadows's Notice of Removal. The State requests that this Court remand to the state court pursuant to 28 U.S.C. § 1455(b)(5) because Meadows fails to show good cause for missing the strict removal deadline and fails to meet the requirements for federal-officer removal.

**MEMORANDUM OF POINTS AND AUTHORITIES**

### I. Introduction

Mark Meadows served as Chief of Staff for former President Donald Trump during the November 2020 presidential election. Trump lost his bid for reelection. In 2024, an Arizona state grand jury indicted Meadows and seventeen other defendants for crimes related to their efforts to overturn Arizona's election results. The indictment charged Meadows with nine state law crimes: Conspiracy,

1

Fraudulent Schemes and Artifices, Fraudulent Schemes and Practices, and six counts of Forgery. (Doc. 1-1, at 42–51). The indictment alleged that Meadows "worked with members of the Trump Campaign to coordinate and implement the false Republican electors' votes in Arizona and six other states." (*Id.* at 60). The indictment further alleged Meadows "was involved in the many efforts to keep [Trump] in power despite his defeat at the polls." (*Id.*).

Among the acts Meadows is alleged to have taken in furtherance of this fraud scheme include: (1) confiding in a White House staffer that Trump had lost the election, but Trump "wanted to keep fighting the election results" and Meadows "wanted to 'pull this off'" for Trump, and (2) receiving and responding to messages about the fake elector scheme from Trump Campaign officials, other members of the conspiracy, and other political figures. (*Id.* at 62–63, 67–68, 73–74, 78). Other evidence, discussed below, show Meadows played an active role in the scheme, including trying to put the then-Governor of Arizona in touch with co-defendant Rudy Giuliani, who led the Trump Campaign's legal challenges to the 2020 election; arranging meetings and phone calls with state officials to discuss the fake elector scheme; arranging a meeting with senior Trump Campaign officials to discuss a memorandum outlining the fake elector scheme; and admitting to members of congress that he had "pushed" for the fake elector scheme.

None of Meadows's electioneering fell under the auspices of his official role as White House Chief of Staff. Two federal courts—the District Court for the Northern District of Georgia and the Eleventh Circuit Court of Appeals—have both rejected Meadows's claims that he was simply "doing his job" as Chief of Staff by participating in efforts to overturn the 2020 election. As he failed to do in Georgia, Meadows now seeks to remove his state prosecution to this Court.

This Court should remand to the state court because Meadows failed to comply with the removal deadline and fails to meet the requirements for federal-officer removal.

## II. Meadows's notice of removal is untimely and he fails to show good cause for his noncompliance with the 30-day deadline.

"A notice of removal of a criminal prosecution shall be filed not later than 30 days after the arraignment in the State court, or at any time before trial, whichever is earlier." 28 U.S.C. § 1455(b)(1). Only if a defendant shows "good cause" may this Court "enter an order granting the defendant … leave to file the notice at a later time." *Id*. The 30-day time limit to file a notice of removal is "mandatory" and "a timely objection to a late petition will defeat removal." *Fristoe v. Reynolds Metals Co.*, 615 F.2d 1209, 1212 (9th Cir. 1980) (addressing civil removal provision); *U.S. ex rel. Walker v. Gunn*, 511 F.2d 1024, 1026 (9th Cir. 1975) (addressing a predecessor removal statute, and noting "the statute, insofar as the time for removal is concerned, is imperative and mandatory, must be strictly complied with, and is to be narrowly construed").

Meadows concedes he failed to meet the 30-day deadline. (Doc. 1, at 8). The grand jury indicted Meadows on April 23, 2024, and Meadows was originally scheduled to be arraigned on May 21, 2024. After securing a 14-day continuance, Meadows was arraigned on June 7, 2024. (Doc. 1-1, at 178, 241). Thus, his notice of removal was due July 8, 2024. Meadows waited until July 26, 2024, to file his notice of removal, making it untimely by 18 days.

Meadows fails to show good cause for missing the mandatory 30-day deadline. Meadows has experience with federal removal proceedings and has previously managed to comply with § 1455(b)'s deadline. After Georgia indicted Meadows for similar offenses, Meadows, represented by Mr. Terwilliger, timely filed a notice of removal to the Northern District Court of Georgia. *See State v. Meadows*, 2023 WL 5281813, at *2 (N.D. Ga. Aug. 16, 2023) (*Meadows I*) (mem.) (initial order finding procedural prerequisites met). Since filing that notice of removal, Meadows participated in an evidentiary hearing on the notice of removal, provided supplemental briefing on his claims, lost in the district court, appealed to

the Eleventh Circuit, engaged in another round of briefing, lost again, and has now petitioned for certiorari to the United States Supreme Court. In short, Meadows has been pursuing removal to federal court for nearly a year and is fully aware of § 1455(b)'s procedural requirements. Meadows's notice of removal in this case is nearly identical to the notice Meadows filed in the Georgia case. *Compare* Doc. 1, *with* Exh. A (Georgia Notice of Removal). It follows essentially the same outline as the Georgia notice, but Meadows has replaced Eleventh Circuit case law with Ninth Circuit case law, and included the relevant facts from the Arizona indictment instead of the Georgia indictment. Given that Meadows managed to timely file a substantially similar notice of removal from scratch in Georgia nearly a year ago, there is no excuse for his failure to comply with the deadline here.

Meadows offers two paltry excuses for his noncompliance. First, he claims he was "pursu[ing] an effort to convince the State that it should not pursue the charges against [him]." (Doc. 1, at 8). This is not accurate, and in any event, does not constitute good cause. On May 6, 2024, two weeks after the grand jury indicted Meadows, his attorney, Mr. Terwilliger, called the prosecutor, Mr. Klingerman. He asked Mr. Klingerman whether the State would review a defense memorandum on Meadows's Supremacy Clause defense and consider dismissing the charges. The State, through Mr. Klingerman, expressed doubt about the validity of the Supremacy Clause argument, given Meadows's recent defeat in the Eleventh Circuit on the same grounds, but agreed to review in good faith any memorandum defense counsel wished to send. Over the next two months, the State had multiple conversations with Meadows's defense team regarding state-court matters, but Meadows's defense team made no further efforts to address the Supremacy Clause arguments until July 22, 2024, well after the 30-day deadline had passed.

On July 22, 2024, Mr. Terwilliger sent Mr. Klingerman a defense memorandum presenting his Supremacy Clause argument. Exh. B. Meadows's counsel asked Mr. Klingerman to "expeditiously review" the memorandum, but

4

did not condition the filing of a notice of removal on the State's response. *Id.* To the contrary, counsel wrote that "as a courtesy," he was informing the State that he would be filing "in short order a notice of removal." *Id.* Thus, contrary to his assertions of good-faith efforts to negotiate with the State to avoid removal to federal court, Meadows fails to show any diligent efforts to negotiate with the State until well after the 30-day deadline had passed. Even after the deadline had passed, Counsel's letter shows he fully intended to notice removal, regardless of the State's response. And even if Meadows had been engaging in good-faith negotiations with the State, nothing prevented him from timely filing the notice of removal or from seeking some other type of tolling agreement from the State. Therefore, Meadows's first excuse for "good cause" does not withstand scrutiny.

Meadows's other excuse for his untimely notice is even less persuasive. He claims he delayed filing the notice because he was waiting for the United States Supreme Court's opinion in *Trump v. United States*, 144 S. Ct. 2312 (2024), which he claims supports removal. (Doc. 1, at 8). But that opinion was released on July 1, 2024, a full week before the 30-day deadline, and his removal notice's discussion of that case constitutes a mere three sentences. (*Id.* at 8). Moreover, the *Trump* opinion offers Meadows no refuge; the majority declined to determine, in the first instance, whether organizing fake electors was private or official action, *see* 144 S. Ct. at 2339, and, in a concurring opinion, Justice Barrett specifically identified the fake elector scheme as falling outside the scope of the official conduct, *see id*. at 2353 n.2 (Barrett, J., concurring in part) ("Sorting private from official conduct sometimes will be difficult—but not always. Take the President's alleged attempt to organize alternative slates of electors. … In my view, that conduct is private and therefore not entitled to protection."). In any event, there is no reason that awaiting the *Trump* decision should have caused Meadows to miss the removal deadline at all—much less by 18 days.

1  Finally, Meadows appears to suggest this Court should find good cause for his untimely notice of removal because he "seeks to remove this proceeding at an early stage, well 'before trial.'" (Doc. 1, at 8). Although earlier versions of the removal statutes permitted defendants to seek removal "at any time before trial," *see Gunn*, 511 F.2d at 1026 (quoting former version of removal statute), this is no longer the correct standard. The current statute required Meadows to file the notice within 30 days of arraignment or "at any time before trial, *whichever is earlier*." 28 U.S.C. § 1455(b)(1) (emphasis added). Meadows's failure to comply with the deadline, without good cause, is an independent and adequate procedural ground for remanding this case to state court. *See New Mexico v. Gutierrez*, 409 F. Supp. 2d 1346, 1350 (D.N.M. 2006) (holding the failure to file notice of removal within § 1455's predecessor statute's thirty-day deadline a sufficient basis for remand); *cf. Thomas v. Baldwin*, 189 F. Supp. 2d 1, 2 (E.D.N.Y. 2002) (remanding civil case to state court where notice of removal was untimely by two days, and rejecting defendant's assertion that settlement negotiations should estop enforcement of the deadline); *In re Clark*, 23-7073, 2024 WL 3385251, at *5 (D.C. Cir. July 12, 2024) (unpublished) (concluding that, even if bar disciplinary proceedings were "otherwise eligible for removal under either the federal-officer or general removal statute," Clark's notice of removal was untimely, which "suffice[d] to defeat his removal of his disciplinary proceeding").[1]

Meadows's latest attempt to remove a prosecution to federal court fails to comply with § 1455(b)'s strict deadline and he cannot show good cause for his untimeliness, so this Court should remand to the state court.

---

[1] In a different context, when considering whether plaintiffs have established good cause or excusable neglect sufficient to reopen a deadline to amend a complaint, courts primarily consider the diligence of the party seeking the amendment and if the party "was not diligent, the inquiry should end." *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 737 (9th Cir. 2013) (quoting *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992))

### III. Procedural noncompliance aside, Meadows fails to satisfy 28 U.S.C. § 1442(a)(1)'s requirements for removal.

Meadows seeks to remove his pending criminal case under 28 U.S.C. § 1455, on the basis that at the time he engaged in the conduct described in the indictment, he was a "federal officer" under 28 U.S.C. § 1442(a)(1). (Doc. 1, at 2). The federal officer removal statute permits removal of actions brought in state court against "any officer (or any person acting under that officer) of the United States or of any agency thereof … for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). To satisfy § 1442(a)(1), a removing party must establish that (1) they are "a person within the meaning of the statute," (2) there is a causal nexus between their actions, taken pursuant to their role as a federal officer, and the State's claims; and (3) they can assert a colorable federal defense. *Doe v. Cedars-Sinai Health Sys.*, 106 F.4th 907, 913 (9th Cir. 2024) (quoting *County of San Mateo v. Chevron Corp.*, 32 F.4th 733, 755 (9th Cir. 2022)).

Although removal rights under § 1442 "are much broader than those under section 1441," *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006), the statute's "broad language is not limitless," *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007). The defendant has the burden of proving by a preponderance of the evidence that the requirements for removal jurisdiction have been met. *Leite v. Crane Co.*, 749 F.3d 1117, 1122 (9th Cir. 2014).

### A. Two courts have rejected Meadows's arguments for removal.

Meadows raised similar claims in his Georgia removal proceedings. Both the district court and the Eleventh Circuit rejected those claims. *See Meadows I*, 692 F. Supp. 3d 1310, 1317 (N.D. Ga. 2023); *see also State v. Meadows* (*Meadows II*), 88 F.4th 1331, 1335 (11th Cir. 2023). After an evidentiary hearing, the district court concluded the "acts alleged against and taken by Meadows" were "outside the scope of [his] federal office," because the Executive Branch has no constitutional role in the administration of states' elections and the Hatch Act's prohibitions on

7

electioneering by executive branch employees "reinforce[d] [its] conclusion that Meadows ha[d] not shown how his actions relate to the scope of his federal executive branch office." *Meadows I*, 692 F. Supp. 3d at 1326-28. In particular, the court found that activities by Meadows, "even if characterized as scheduling meetings or phone calls or taken for the purpose of advising the President" were "political activities" because the "underlying substance of those meetings and calls were related to political activities and not to the scope of Meadows's federal office." *Id.* at 1331. Finally, the court determined that "Section 1442's purposes would not be fulfilled by removal" because the Georgia indictment alleged acts, "as well as Meadows's presented evidence, … all indicate that federal officials (or those purporting to act on behalf of federal officials) engaged in post-election activities that clearly fall outside executive authority and expressly within the constitutional gamut of the States." *Id.* at 1333.

The Eleventh Circuit affirmed on two grounds. The court first held that § 1442 did not apply to former federal officials. *Meadows II*, 88 F.4th at 1335. The court then held that even if § 1442 applied to former federal officials, "the events giving rise to this criminal action were not related to Meadows's official duties." *Id.* If this Court rules that § 1442 does not apply to former federal officials, it should go further, as both federal courts in Georgia held, and reach the issue of whether the charged conduct was performed under color of federal office. In line with the courts' holdings in Georgia, this Court should hold that the conduct alleged in the Arizona indictment against Meadows was not performed under color of federal office, and that Meadows has not presented a colorable federal defense.

> **B.**   ***The "color" of Meadows's office as Chief of Staff does not extend to electioneering on behalf of President Trump's campaign.***

Before reaching the causal nexus between the charged conduct and Meadows's official authority as Chief of Staff, the scope of Meadows's authority must first be determined. Meadows must identify a source of positive law for his

8

assertions of official authority to interfere in a state election before this Court can determine whether his alleged acts were attributable to exercises of that authority. *See Cunningham v. Neagle*, 135 U.S. 1, 75 (1890) (an official act is an "act which [the officer] was *authorized to do by the law of the United States*" (emphasis added)); *Spalding v. Vilas*, 161 U.S. 483, 498 (1896) (official actions are those "*committed by law* to [the officer's] control or supervision" (emphasis added)).

Meadows fails to cite *any* law granting the Executive Branch authority to meddle in state administration of elections (*see* Doc. 1, at 6–7), and he has previously conceded that the Chief of Staff does not have authority to campaign for the President's reelection, (*id.* at 52). Meadows directs this Court to his own self-serving testimony in the Georgia removal proceedings as evidence showing the scope of his official duties. (*Id.* at 11 & n.5). But both the district court and the Eleventh Circuit rejected Meadows's expansive description of the scope of his duties, finding it "nearly limitless." *See Meadows II*, 88 F.4th at 1345-46 ("We cannot rubber stamp Meadows's legal opinion that the President's chief of staff has unfettered authority, and *Acker* does not instruct us to eschew our duty of independent review."). Like the Eleventh Circuit, this Court should find Meadows's "theory of the case is not plausible" and reject such an "expansive proclamation of executive power relying on no source of positive law." *Id.* at 1346.

Though not present in his notice of removal here, in his Eleventh Circuit briefing, Meadows listed several statutes and constitutional provisions he claimed empowered the President, and, by extension, himself, to ensure federal voting laws were enforced. *Meadows II*, 88 F.4th at 1346–47. The Eleventh Circuit rejected each contention, finding none of them related to the President or the Chief of Staff, and certainly did not extend to permitting the President to "influenc[e] which candidate prevails." *Id.*; *Thompson v. Trump*, 590 F. Supp. 3d 46, 82 (D.D.C. 2022) ("The Office of the President has no preference for who occupies it."). Although the Supreme Court in *Trump* appeared to entertain an argument that the

Take Care Clause "plainly encompasses enforcement of federal election laws," the Court declined, in the first instance, to determine whether the fake electors scheme fit within the President's duties under the Take Care Clause. *Trump*, 144 S. Ct. at 2339. The district court in Georgia and the Eleventh Circuit both addressed the Take Care Clause and found it did not provide the Chief of Staff any authority to "supervis[e] states' administration of elections." *Meadows II*, 88 F.4th at 1346–47

The Constitution "does not spell out a role for the President in the operation of state voting procedures in federal elections." *Meadows II*, 88 F.4th at 1346–47. The Constitution empowers only the states and Congress to "regulate the conduct of [federal] elections." *Roudebush v. Hartke*, 405 U.S. 15, 24 (1972); *see* U.S. Const. art. I, § 4, cl. 1; art. II, § 1, cl. 2. The states are responsible for enacting "a complete code for ... elections," including "regulations relat[ing] to ... prevention of fraud and corrupt practices [and] counting of votes." *Moore v. Harper*, 600 U.S. 1, 29 (2023) (first alteration in original) (internal quotation marks omitted) (quoting *Smiley v. Holm*, 285 U.S. 355, 366 (1932)).

Additionally, the Hatch Act prohibits federal officials from electioneering on behalf of a political campaign, further reducing the credibility of Meadows's expansive description of his role as Chief of Staff. The Hatch Act has no exceptions to its prohibition on a federal official using his "official authority or influence for the purpose of interfering with or affecting the result of an election." 5 U.S.C. § 7323(a)(1). And the prohibition extends to any participation in "activity directed toward the success or failure of a political party, candidate for partisan political office, or partisan political group." 5 C.F.R. §§ 734.101, 734.302(b)(2).

### C. Meadows has not shown that this prosecution is "for or relating to any act" under the color of his position as Chief of Staff.

Once the scope of Meadows's role as Chief of Staff is placed in proper context, Meadows bears the burden to demonstrate that he is a federal officer subjected to criminal prosecution "for or relating to any act under color of such

office." 28 U.S.C. § 1442(a)(1). In other words, he must show that there "is a causal nexus between [his] actions, taken pursuant to [his role as a federal officer] ... and the [State's] claims." *Fidelitad, Inc. v. Insitu, Inc.*, 904 F.3d 1095, 1099 (9th Cir. 2018) (quoting *Durham*, 445 F.3d at 1251); *see also Meadows II*, 88 F.4th at 1348. "The phrase 'relating to' is broad and requires only a 'connection' or 'association' between the act in question and the federal office." *Caver v. Cent. Ala. Elec. Coop.*, 845 F.3d 1135, 1144 (11th Cir. 2017) (internal citations omitted).

Despite the broad language, other circuits have held that the connection between the charged conduct and an official duty may be "too remote," *Minnesota by Ellison v. Am. Petroleum Inst.*, 63 F.4th 703, 715 (8th Cir. 2023), or "too tenuous to support removal," *Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178, 234 (4th Cir. 2022), *cert. denied*, 143 S. Ct. 1795 (2023) (mem). And federal courts have long recognized that a "more detailed showing" of connection between charged conduct and asserted official authority "might be necessary because of the more compelling state interest in conducting criminal trials in the state courts." *Willingham v. Morgan*, 395 U.S. 402, 409 n.4 (1969); *see also Colorado v. Symes*, 286 U.S. 510, 518 (1932) (jurisdiction should not be "wrested" from state courts "in the absence of a full disclosure of the facts constituting the grounds on which [a defendant] claim[s] protection").

Like the Georgia indictment, the Arizona indictment included several acts attributed to Meadows. But the State was not required to lay out its entire case in the indictment. *See State v. Far W. Water & Sewer Inc.*, 228 P.3d 909, 923, ¶ 36 (Ariz. App. 2010) (detailing Arizona's notice-pleading rule for indictments). If this Court reaches the under-color-of-office issue, it may consider not only the facts alleged in the indictment, but those alleged by the State in this response and any facts developed at the evidentiary hearing. The inquiry "hinges on whether Meadows's association with the conspiracy related to the color of his office," but jurisdiction "is not conferred simply because a single overt act relates to

11

Meadows's federal office." *Meadows I*, 692 F. Supp. 3d at 1324. Rather, "the relevant inquiry is what activities go to the *heart* of Meadows's participation in the enterprise and whether those activities relate to the scope of his federal office." *Id.*

Meadows asserts that "[t]he charged conduct comprises acts taken by Mr. Meadows, whether in an individual or official capacity, under color of his role as Chief of Staff to the President of the United States." (Doc. 1, at 6).[2] He then characterizes the conduct alleged in the indictment as consisting "almost entirely of allegations that he received and occasionally responded to messages from people who were trying to get those ideas in front of President Trump or seeking to inform Mr. Meadows about the strategy and status of various campaign efforts." (*Id.* at 6). He then suggests that in his official capacity as Chief of Staff, he was a bulwark between conspiracy theorists and the President. (*Id.* at 7 ("Only by being aware of such proposals could the Chief of Staff ensure that the President is getting sound advice to combat any unsound advice he may be receiving.")).

Meadows was not indicted for being a "filter for the President's time and attention," (*id.* at 2), but a conspirator in the attempt to fraudulently overturn the 2020 election results. Beyond the acts alleged in the indictment, other messages sent to and from Meadows show he was actively participating and spearheading efforts to organize the fake elector scheme in multiple states, none of which constituted his official duties as Chief of Staff.

By only focusing on the character of the evidence cited in the indictment, i.e., that they are communications he received or conversations he had while serving as Chief of Staff, Meadows ignores their content and context. At the outset, Meadows's receipt and responses to various proposals to overturn the election are related to the formulation and coordination of efforts by the Trump campaign, its

---

[2] It is not clear what Meadows means by "whether in an individual or official capacity"; if he was not acting as a federal officer when he performed the activities giving rise to the indictment, the inquiry ends and he is not entitled to removal.

affiliates, and its supporters to challenge the results of the election. Contrary to Meadows's claims, he did not receive those messages "because he was the Chief of Staff to the President," (Doc. 1, at 7), but because he joined in the fraud scheme.

Those messages are also emblematic, if not direct evidence, of Meadows's involvement in the discussion, planning, and coordination of a nationwide effort to overturn the election results through fraudulent means, including efforts in Arizona and specifically the fake elector scheme. These were electioneering efforts engineered by state and national Republican Party officials and other supporters of then-President Trump seeking to install him for a second term. The evidence shows Meadows working hand-in-glove with these political efforts. Some of the messages Meadows sent and received from his personal phone and using his personal Apple account, *see* Exh. F (letter from Meadows), include the following:

- On November 5, 2020, Meadows messaged an individual in Georgia from his personal email account, stating, "The state legislature can take over the electoral process. Could you call [another individual] so he can explain how the problem could be solved by State legislators." Exh. C, at 20.

- On November 7, 2020, Kelli Ward, then-chair of the Arizona Republican Party and Meadows's co-defendant in the state proceedings, messaged Meadows asking for his help in communicating with "our attorneys in AZ" about getting a hand count in various precincts, telling him the attorneys were "freezing [her] out." Meadows responded, "I will push them." Twenty-five minutes later, Ward replied, "Thank you – they called." Exh. C, at 28.

- On November 13, 2020, Meadows received a series of messages from Matt Schlapp, lobbyist and chairman of the American Conservative Union, stating the need for (1) more money allocated to Nevada, (2) "a leader on the ground in each state," and (3) "20 or so highly co[m]petant people" to coordinate logistics, press, and "legal work." Meadows responded, "[m]oney has been allocated for Nevada. Tell me what you need. Just to spoke to

13

Ronna." Exh. C, at 52. Ronna McDaniel, at the time, was Chair of the Republican National Committee. A second group chat involving Schlapp, McDaniel, Meadows, and another individual clarifies the money being discussed was meant to go from the Trump Campaign and the Republican National Committee to the "NV GOP." *Id.* at 52–53.

- On November 22, 2020, Meadows asked Congressman Biggs for then-Arizona Governor Doug Ducey's cell phone, and then texted Ducey: "Governor. Mayor Giuliani is trying to reach you about the election results in Arizona. Thanks for all you do[.]" Exh. D, at 9.

- In a December 6, 2020, group email with Jason Miller, a senior Trump campaign official, Meadows stated, "Let's have a discussion about this [an attached memo from co-conspirator Chesebro outlining the fake elector scheme] tomorrow." Later in the conversation, Meadows insisted "We just need to have someone coordinating the electors for states[.]" (Doc. 1, at 157–161).

- On December 8, 2020, Senator Mike Lee texted Meadows urging Meadows implement the fake elector scheme. Meadows responded, "I am working on that as of yesterday." Exh. D, at 26.

- On December 8, 2020, Woody Jenkins texted Meadows recommending Trump electors meet at state capitols in swing states and cast votes for Trump. Meadows responded, "We are." Exh. D, at 27.

- On January 5, 2021, Congressmen Jim Jordan sent Meadows a text urging then-Vice President Mike Pence to "call out all electoral votes that he believes are unconstitutional as no electoral votes at all," and, citing various purported legal authorities, argued, that "[f]ollowing this rationale, an unconstitutionally appointed elector, like an unconstitutionally enacted statute, is no elector at all." Meadows responded, "I have pushed for this. Not sure it is going to happen[.]" Exh. E, at 6.

All of this was "activity on behalf of the Trump reelection campaign [that] was unrelated to Meadows's federal duties," as the Eleventh Circuit recognized, and thus cannot be the basis for removal. *Meadows II*, 88 F.4th at 1348. Not only is that the most plausible understanding of Meadows's actions, but Meadows has failed to show he had *any* authority in his role as Chief of Staff to coordinate and participate in a fraudulent scheme to overturn the will of Arizona voters. Meadows thus cannot show that the charges "relat[e] to any act under color of [his] office." 28 U.S.C. § 1442(a)(1).

### D. Meadows fails to assert a colorable federal defense.

The third requirement for federal removal is that the defendant must "assert a colorable federal defense." *Cedars-Sinai Health Sys.*, 106 F.4th at 913. Meadows bears the burden of proving by a preponderance of the evidence that his defense is colorable. *Leite*, 749 F.3d at 1124. In his notice, Meadows contends he has a federal defense of Supremacy Clause immunity. (Doc. 1, at 4).

Supremacy Clause immunity requires the defendant to show both that he was carrying out "an act which he was authorized to do by the law of the United States" and that in doing so, "he did no more than what was necessary and proper for him to do." *Neagle*, 135 U.S. at 75. Such immunity "is not absolute and so presupposes that federal agents can be prosecuted for violating state law." *Idaho v. Horiuchi*, 253 F.3d 359, 366 (9th Cir.), *vacated as moot,* 266 F.3d 979 (9th Cir. 2001). The purpose is "to prevent states from nullifying federal laws by attempting to impede enforcement of those laws," and should be "sparingly exercised." *See Morgan v. California*, 743 F.2d 728, 731 (9th Cir. 1984).

Regarding the first prong, Meadows argues he need only show that the actions were part of his "general role and authority," referring to his argument that as chief of staff he received and facilitated communications directed at the president. (Doc. 1, at 10). But as a federal employee, he was expressly prohibited from taking part in electioneering by the Hatch Act. 5 U.S.C. § 7323. Specifically,

15

the Hatch Act prohibited him from the use of "official authority or influence for the purpose of interfering with or affecting the result of an election." 5 U.S.C. § 7323(a)(1). As explained above, Meadows is charged based on his conduct related to his unauthorized interference with state election procedures or prohibited campaigning. None of this was permitted, and Meadows cannot "with impunity ignore the limitations which the controlling law has placed on his powers." *Denson v. United States*, 574 F.3d 1318, 1347 (11th Cir. 2009) (quoting *Butz v. Economou*, 438 U.S. 478, 489 (1978)).

Turning to the second prong, the defendant must show that he had an "honest and reasonable belief that what he did was necessary in the performance of his duty." *Horiuchi*, 253 F.3d at 366; *see also Clifton v. Cox*, 549 F.2d 722, 730 (9th Cir. 1977). He must also show he had "no motive other than to do his job." *Horiuchi*, 253 F.3d at 366 (quoting *Whitehead v. Senkowski*, 943 F.2d 230, 234 (2d Cir. 1991)). Indeed, if the evidence shows a federal officer acted "out of malice or with some criminal intent," the defense is unavailable. *See Clifton*, 549 F.2d at 728; *Arizona v. Files*, 36 F. Supp. 3d 873, 878 (D. Ariz. 2014); *see also Texas v. Kleinert*, 855 F.3d 305, 317 (5th Cir. 2017) (evidence of personal interest, malice, or criminal intent negates subjective reasonableness); *Baucom v. Martin*, 677 F.2d 1346, 1350 (11th Cir. 1982); *New Jersey v. Bazin*, 912 F. Supp. 106, 116 (D.N.J. 1995).

Meadows cannot show he had an honest and reasonable belief that what he did was necessary in the performance of his duty. He admitted in the Northern District of Georgia that both he and President Trump had a "personal interest" in the outcome of the election. (Doc. 1, at 76, 77, 101, 159). His actions coordinating among people seeking recounts and funding for state actions, reaching out to state officials to influence election results, and helping coordinate the fake elector scheme, were all in service of and interference with elections. As he was aware, such electioneering was impermissible and carried out in pursuit of his own

interests. Meadows cannot meet his burden of showing a colorable claim of Supremacy Clause immunity.

## IV. Removal here would not serve the purpose of the federal-officer removal statute.

The removal statute's "purpose is to protect the Federal Government from the interference with its operations that would ensue" were a State able to arrest and try a federal officer for "acting … within the scope of [his] authority." *Watson*, 551 U.S. at 150 (quotation marks omitted). Such "interference" would flow from the fact that "[s]tate-court proceedings may reflect local prejudice against unpopular federal laws or officials." *Id*. (quotation marks omitted) (quoting *Maryland v. Soper (No. 1)*, 270 U.S. 9, 32 (1926)).

The statute's purpose to prevent interference with federal operations would not be served by removing the charges against Meadows from state court. This prosecution does not threaten to impede any federal policy or prevent the federal government from carrying out its operations. *See Meadows II*, 88 F.4th at 1346–47 (noting a "state prosecution of a *former* officer does not interfere with ongoing federal functions—case-in-point, no one suggests that Georgia's prosecution of Meadows has hindered the current administration"). The charges are not unjustified retribution for a legitimate exercise of federal authority. Arizona, not the federal executive, is responsible for administering the selection of its presidential electors and assuring the integrity of that selection. Allowing it to do so, including by leaving it to the State's own courts to adjudicate any alleged violations of the State's criminal laws, is in no way contrary to, and in fact is fully consistent with, the purpose of the federal-officer removal statute.

The Constitution entrusts the administration of federal elections to the States. It deliberately insulates such administration from the President and his staff. Consistent with that constitutional design, the federal-officer removal statute does not permit removal here.

## V. Conclusion

For these reasons, the State respectfully requests this Court remand the case back to state court.

Respectfully submitted August 26, 2024.

Kristin K. Mayes
Attorney General

Nicholas Klingerman
Krista Wood
Casey D. Ball
Assistant Attorneys General

s/ Nicholas Klingerman
Assistant Attorney General
Attorneys for the State of Arizona

# CERTIFICATE OF SERVICE

I hereby certify that on August 26, 2024, I electronically transmitted the attached document to the Clerk's Office using the ECF System for filing and served the attached document using ECF, who is a registered participant of the ECF System:

Anne Chapman
Lee Stein
Kathleen E. Brody
MITCHELL | STEIN | CAREY | CHAPMAN, PC
2600 North Central Avenue, Suite 1000
Phoenix, AZ 85004
anne@mscclaw.com
lee@mscclaw.com
kathy@mscclaw.com

George J. Terwilliger III*
P.O. Box 74
Delaplane, VA 20144
George@gjt3law.com
*Pro Hac Vice

Defendant's Counsel


s/ E.M.A.V.

**LIST OF EXHIBITS**

| | |
|---|---|
| Exhibit A. | Meadows's Notice of Removal in the Georgia Case |
| Exhibit B. | Letter from Mr. Terwilliger to Mr. Klingerman Dated July 22, 2024 |
| Exhibit C. | Print-out of Meadows's Incoming and Outgoing Messages from November 3, 2020, to January 20, 2021 (Part 1). |
| Exhibit D. | Print-out of Meadows's Incoming and Outgoing Messages from November 3, 2020, to January 20, 2021 (Part 2). |
| Exhibit E. | Print-out of Meadows's Incoming and Outgoing Messages from November 3, 2020, to January 20, 2021 (Part 3). |
| Exhibit F. | Letter from Meadows's Counsel Describing Messages Transmitted to the January 6th Committee. |