Anne Chapman (#025965)
Lee Stein (#012368)
Kathleen E. Brody (#026331)
anne@mscclaw.com
lee@mscclaw.com
kathy@mscclaw.com
MITCHELL | STEIN | CAREY | CHAPMAN, PC
2600 North Central Avenue, Suite 1000
Phoenix, AZ 85004
Telephone: (602) 358-0290
Facsimile: (602) 358-0291

George J. Terwilliger III*
P.O. Box 74
Delaplane VA 20144
George@gjt3law.com
*Pro Hac Vice

*Attorneys for Mark Meadows*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| State of Arizona, | No. CV-24-02063-001-PHX-JJT |
| Plaintiff, | |
| v. | **DEFENDANT'S REPLY IN SUPPORT OF NOTICE OF REMOVAL** |
| Mark Meadows, | |
| Defendant. | |

The State asks the Court to sanction prosecution of a former White House Chief of Staff in state court based on arguments flatly inconsistent with controlling precedent, *see DeFiore v. SOC LLC*, 85 F.4th 546, 557 (9th Cir. 2023), and the text and purpose of 28 U.S.C. § 1442(a)(1).  This case illustrates why the Founders adopted the Supremacy Clause to protect federal operations; why Justice Marshall added judicial muscle to that

1    Clause, anticipating increased state interference over time; and why Congress for over

2    200 years—and as recently as 2011—has legislated increasing access to federal courts for

3    state-law claims relating to a federal officials' conduct. Arizona's core arguments not

4    only ignore history and precedent; they turn the bedrock rule that federal issues are to be

5    litigated in a federal forum on its head.

6           This case raises *federal* questions that should be addressed in a *federal* forum. Not

7    least is Mr. Meadows' Supremacy Clause immunity defense. The very point of

8    § 1442(a)(1) is for that "colorable federal defense," *Mesa v. California*, 489 U.S. 121,

9    129 (1989), to be removable—regardless whether it ultimately prevails, *see DeFiore*, 85

10   F.4th at 557. No doubt recognizing the strong case for removal under Ninth Circuit

11   precedent, the State focuses instead on decisions of the Northern District of Georgia and

12   Eleventh Circuit which denied removal in a separate matter. Following that path would

13   be a grave mistake.

14   **I.     The State's Reliance on the Eleventh Circuit's Georgia Decision Is Misplaced;**
         **Ninth Circuit Precedent Controls**
15
         The State relies heavily on the district court and Eleventh Circuit decisions to
16
     argue against removal here. *See* Resp. 7–15. But those decisions—on which a petition for
17
     writ of certiorari is pending, *see* Ex. B—are wrong, are not controlling, and conflict with
18
     relevant Ninth Circuit precedent that *is* controlling.
19
         The Eleventh Circuit fundamentally erred by concluding that Meadows failed to
20
     prove a "causal nexus" between the Georgia charges and his official duties, which it
21
     equated with proving that the Chief of Staff's "authority . . . extend[s] to an alleged
22
     conspiracy to overturn valid election results." *Id.* at 1344. Contrary to that misguided
23
     analysis, the Ninth Circuit has expressly recognized that Congress expanded removal
24
     beyond the "causal-nexus" test in 2011. *See DeFiore v. SOC LLC*, 85 F.4th 546, 557 n.6
25
     (9th Cir. 2023) ("We note that in 2011 Congress amended § 1442(a)(1) to allow removal
26
     by federal officers . . . of suits 'for *or relating to* any act under color of such office' . . . .
27
     By so amending the statute, Congress broadened federal officer removal to actions, not
28

just *causally* connected, but alternatively *connected* or *associated*, with acts under color of federal office.") (cleaned up). In this respect, the Ninth Circuit "join[ed] all the courts of appeals that have replaced causation with connection." *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 944 (7th Cir. 2020).

That precedent contradicts the Eleventh Circuit's *Meadows* ruling and the State's argument. *See, e.g.*, Resp. 8 ("[T]his Court should hold that the conduct alleged in the Arizona indictment against Meadows was not performed under color of federal office."). Mr. Meadows does *not* need to show he is being prosecuted for acts performed under color of his office, though he would meet that test; he "only need[s] to show that the actions [he] took which gave rise to the [State's charges] resulted from [his] work for [the President]." *DeFiore*, 85 F.4th at 557. Under the 2011 amendment, it is sufficient that the state charges "relate to" the official role.[1]

The Court should decline the State's invitation to error and follow the Ninth Circuit's lead in broadly construing the Federal Officer Removal Statute.

## II. The State's Arguments About the Scope of the White House Chief of Staff's Duties Are Federal Issues That Support Removal

The State argues that Mr. Meadows did not act within the "color" of his office because he allegedly engaged in electioneering, *see* Resp. 8–10, but that is wrong in many ways. It applies the wrong standard; it fails to capture the Chief of Staff's role; and it presents a federal question, confirming this case belongs in federal court.

*First*, Mr. Meadows has shown, at least sufficiently for the threshold purpose of removal, that his charged conduct—essentially, facilitating communication to and from

---

[1] The Eleventh Circuit also erred by resorting its own reckoning and in reliance on its own precedent, to be the first court "in the 190-year history of the federal officer removal statute [to] rule[] that former officers are excluded from removal." *State v. Meadows*, 88 F.4th 1331, 1342 (11th Cir. 2023). Even the State here does not argue affirmatively that the Court should join that view; in fact, the State expressly argues that the Court should *not* rest its removal decision on that basis. *See* Resp. 8.

the President related to the 2020 Election—was within the scope of his official duties.[2]

Mr. Meadows arranged meetings between the President and both public officials and

private citizens for myriad purposes. Whether or not the President's reason for holding a

meeting was official, personal, or political, the Chief of Staff participated as part of his

job, as he needed to understand what was going on in case he needed, *e.g.*, to redirect the

President's focus to critical issues of national import. That included understanding the

President's political and campaign objectives in order to manage his time and compete

with the campaign for his attention. And, in the wake of the election, it included filtering

the tsunami of election fraud allegations flowing to the President: Mr. Meadows needed

to understand what was coming across the President's desk, separate the "wheat from the

chaff," and route allegations to DOJ and/or the campaign as appropriate.

This Court must "credit [Mr. Meadows's] theory of the case . . . that the suit is 'for

a[n] act under color of office.'" *Jefferson Cnty. v. Acker*, 527 U.S. 423, 432 (1999). The

State asks the Court to disregard Mr. Meadows' account as "not plausible" and overly

"expansive." Resp. 9. But even the State acknowledges that the Supreme Court has flatly

contradicted the view of federal election authority espoused in the Georgia cases and

squarely held that the President's official responsibility (and, by extension, the

responsibility of his Chief of Staff) "'plainly encompasses enforcement of federal

election laws.'" Resp. 10 (quoting *Trump*, 144 S. Ct. at 2339); *cf. State v. Meadows*, 88

F.4th 1331, 1346–47 (11th Cir. 2023); *Georgia v. Meadows*, 692 F. Supp. 3d 1310, 1328

n.13 (N.D. Ga. 2023). And precedent makes clear that, for a senior official with broad

discretion, the "outer perimeter" of his duty is equally broad. *Clifton v. Cox*, 549 F.2d

722, 726–27 (9th Cir. 1977).

---

[2] On this point, here and at the upcoming hearing, Mr. Meadows intends to rely primarily
on: (a) the descriptions of his conduct alleged in the State's indictment itself; (b) his prior
testimony in the Georgia removal hearing, which is already in the record here; (c) an
affidavit from Mr. Meadows, *see* Ex. C. And (d) his Presidential commission, which
documents his appointment as White House Chief of Staff, *see* Ex. A to Ex. C.

1      *Second*, Mr. Meadows' case for removal is supported by the superseding

2   indictment filed this week by Special Counsel Jack Smith in *United States v. Trump*, No.

3   23-cr-257 (TSC) (D.D.C.). In describing an episode related to the election results in

4   Georgia which Georgia prosecutors claim showed Mr. Meadows' participation in a state

5   crime, the federal indictment instead notes that Mr. Meadows participated because, as

6   "Chief of Staff, . . . [he] sometimes handled private and Campaign-related logistics for

7   [the President]." Superseding Indictment (No. 23-cr-257 (TSC) ECF No. 226), ¶ 33. This

8   is not an alleged criminal act by Mr. Meadows; as Chief of Staff, he was carrying out his

9   official duties, even if the President was engaged in "unofficial" activity. That is

10   consistent with his own prior testimony. *See generally* ECF No. 1, Exh. A (Tr. of GA

11   Evidentiary Proceedings). Notably, unlike the overzealous prosecutors here and in

12   Georgia, the Department of Justice—the prosecutorial body *actually* charged with

13   policing the conduct of federal officials—has never charged Mr. Meadows with any

14   crime, nor identified him as an unindicted co-conspirator.

15      *Third*, even if there were residual doubt about the precise contours of the Chief of

16   Staff role and how that related to the State's charges, that would only further support

17   removal to a *federal* forum. The State argues, for example, in attempting to distinguish

18   the *Trump* immunity decision, that the Supreme Court "declined to determine, in the first

19   instance, whether organizing fake electors was private or official action." Resp. 5 (citing

20   *Trump*, 144 S. Ct. at 2339; *id.* at 2353 n.2 (Barrett, J., concurring in part)); *see id* at 10.

21   But the State offers no support for the notion this *federal* question about the scope of a

22   federal official's duties should be resolved in the first instance in *state* court.[3] Any lack of

23   precision or broad discretion in the Chief of Staff's role is not an invitation for States to

24   _____

25   [3] The State's drive-by invocation of the federal Hatch Act, *see* Resp. 10, only further
    reinforces the point. Mr. Meadows never violated the Hatch Act, and in any event, it does

26   not define the contours of official action for purposes of removal. Indeed, the allegation of
    a Hatch Act violation presupposes that the official was engaged in official conduct which

27   would support removal. But for present purposes, the relevant point is that Congress

28   intended for contested federal issues about an official's conduct and his resultant
    entitlement to immunity should be litigated in federal court.

police that role. Indeed, the Separation of Powers precludes the courts—just as the Supremacy Clause precludes the States—from defining the Chief of Staff's role. *Cf. Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 387 (2004) (emphasizing need for other branches to "safeguard against unnecessary intrusion into the operation of the Office of the President").

*Finally*, the State does not even attempt to show—as Georgia purportedly did— that the "gravamen" of its charges lie outside Mr. Meadows' duties. Rather, the State relies on *unindicted* allegations, *see* Resp. 11–15, citing Arizona's lax "notice-pleading rule for indictments," Resp. 11 (citing *State v. Far W. Water & Sewer Inc.*, 228 P.3d 909, 923, ¶ 36 (Ariz. App. 2010)). But that state-law pleading standard does not give the State license to sand-bag a federal official by indicting on one set of allegations and opposing removal on another. At any rate, the bait and switch is to no avail. It is not the State's allegations that matter; it is assertion of a colorable federal defense. The State's new accusations are subject to the same defense, and they in no way sever the connection to Mr. Meadows' federal role.

**III.    Mr. Meadows Has a "Colorable" Immunity Defense**

Mr. Meadows served as Chief of Staff to President Trump; he facilitated communication to and from the President, including communication related to his campaign and the 2020 Election; and under the Supremacy Clause, Mr. Meadows asserts that the State of Arizona lacks authority to prosecute him for such acts, even those within the outer perimeter of his official duties. "Official immunity is a colorable federal defense." *Bahrs v. Hughes Aircraft Co.*, 795 F. Supp. 965, 969 (D. Ariz. 1992). "The Supreme Court has stated that 'one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court.'" *Id.* (quoting *Willingham v. Morgan*, 395 U.S. 402, 407 (1969)). That should be enough to begin and end the inquiry. The State argues that Mr. Meadows does not have a *meritorious* defense, *see* Resp. 15–16, but those arguments are premature (not to mention wrong). "The question is not whether a defendant's claimed defense is meritorious, but only whether a

1    colorable claim to such a defense has been made." *Id.* (citing *Mesa v. California*, 489

2    U.S. 121 (1989)).[4] "The officer need not win his case before he can have it removed."

3    *Willingham*, 395 U.S. at 407. Here, stripped of the State's rhetorical accusations of bad

4    motive, which have no place in analysis of whether Meadows' belief was objectively

5    reasonable, Meadows easily meets this test of having a colorable defense based on federal

6    law.

7    **IV.      The State's Appeal to the Purpose of § 1442(a)(1) Is Unavailing**

8         The State finally argues its prosecution "does not threaten to impede any federal

9    policy or prevent the federal government from carrying out its operations." Resp. 17. But

10   that is pure *ipse dixit*. Of course, the State's prosecution of a former Chief of Staff for his

11   dealings with the President threatens to interfere with federal operations. Consider briefly

12   the implications of the State's position: When the President asks to arrange a meeting or

13   phone call, the Chief of Staff must now consider not only those factors dictated by his

14   federal role: When should it take place? Who else should be involved? What prep

15   materials might the President need? He now must consider also whether it will expose

16   him to later state prosecution: Is this really in my job description? Is it "political," such

17   that it might later be deemed non-official "electioneering"? That is precisely the sort of

18   state intrusion into the federal sphere that the Supremacy Clause and the Federal Officer

19   Removal Statute are intended to eliminate.[5]

20

21

22

23   [4] The Ninth Circuit has made clear that pleading a colorable defense for purposes of removal is as easy to satisfy as pleading federal question jurisdiction. *DeFiore*, 85 F.4th at

24   559–60.

25   [5] Indeed, even a majority of the judges in the Eleventh Circuit appeal acknowledged a "nightmare scenario" in which "a rogue state's weaponization of the prosecution power"

26   could "paralyze our democratic-republic system of government," which depends on having "talented and enthusiastic people willing to serve in public office." *Meadows*, 88 F.4th at

27   1351 (Rosenbaum, J., concurring). Fortunately, the Court need not wait for that nightmare

28   to materialize. It can follow the plain text of § 1442(a)(1) and controlling Ninth Circuit precedent to permit removal.

1

2

3

## V.    The Notice of Removal Is Not Untimely

Mr. Meadows delineated good cause to allow removal under 28 U.S.C. § 1455, and the State offers no good reason why the Court should not allow it.

4

5

6

7

8

***First***, the State mistakenly argues that the 30-day deadline is "mandatory," Resp. 3, citing cases that discuss the *civil* removal provision, 28 U.S.C. § 1446(b)(1). While the civil provision contains no such flexibility, § 1455(b)(1) expressly provides that the Court may permit removal "at a later time" "for good cause shown." To the extent the State means to suggest the Court lacks discretion, it is flatly wrong.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

***Second***, the State's arguments on the equities fail. The State identifies no prejudice it suffered by receiving Mr. Meadows' Notice of Removal on July 26, 2024, rather than July 8, 2024—nor is any such prejudice conceivable. Even the State must acknowledge that Mr. Meadows filed his Notice well before trial and only "18 days" after it ordinarily would have been due. Resp. 3. Instead, the State argues that Mr. Meadows' reasons for waiting do not constitute "good cause." *See* Resp. 4–5. But the State's argument is disingenuous and self-contradictory; it simultaneously complains that Mr. Meadows waited *too long*, filing 18 days after the default 30-day period, and that he filed it *too soon*, without giving the State more time to review and consider a memorandum he had submitted arguing for the State to drop the charges. *See* Resp. 5. Obviously, Mr. Meadows had good reason to be concerned that waiting longer to file could risk his ability to remove; but that does not mean that he did not have good reason to try to resolve matters with the State first. Indeed, removal in no way alters the State's ability to dismiss charges. *See* FED. R. CRIM. P. 1(a)(4) ("Although these rules govern all proceedings after removal from a state court, state law governs a ***dismissal by the prosecution***.") (emphasis added).

25

26

27

28

And while the State argues that the pendency of the Supreme Court's decision in *Trump v. United States*, 144 S. Ct. 2312 (2024), did not justify delay, *see* Resp. 5, the State's own (unconvincing) effort to distinguish that case, *see* Resp. 5, 9–10, belies the assertion. The decision is plainly relevant to Mr. Meadows' immunity defense and thus,

1   by extension, to his effort to remove the case to secure a federal forum for the

2   adjudication of that defense.[6]

3       *Finally*, in applying the time limits for removal, the Court must consider the

4   context of federal-officer removal and heed the "clear command from both Congress and

5   the Supreme Court that when federal officers and their agents are seeking a federal

6   forum, [courts] are to interpret section 1442 broadly in favor of removal." *Durham v.*

7   *Lockheed Martin Corp.*, 445 F.3d 1247, 1252 (9th Cir. 2006). "[R]emoval rights under

8   section 1442 are much broader than those under section 1441," and in assessing the

9   timeliness of removal under 1442, the Court must be "[m]indful of these differences, and

10   the justifications for removal that they reflect." *Id.* at 1253. In accordance with this Ninth

11   Circuit precedent, the Court should err on the side of permitting removal.

12               RESPECTFULLY SUBMITTED on August 29, 2024.

13

                    MITCHELL | STEIN | CAREY | CHAPMAN, PC

14

15               By:   */s/ Anne Chapman*

16                     Anne Chapman
                      Lee Stein

17                     Kathleen E. Brody

18

                     George J. Terwilliger III*

19                     * *Pro Hac Vice*

20                     *Attorneys for Defendant Mark Meadows*

21

22

23     [6] The State wholly misses the point in arguing that removal is not permitted "at any time

24   before trial." Resp. 6. The point is not that the 30-day deadline did not apply, but rather
     that the State suffers no prejudice here because the case is removed well before trial. The

25   criminal-removal procedures in § 1455 were developed in the 1970s to address

26   gamesmanship, such as removing cases on the eve of trial; Congress's aim was "to
     minimize the disruption and unnecessary delay . . . from frivolous and dilatory petitions

27   for removal . . . but, at the same time, provide *a fair opportunity for the defendant with*

28   *grounds for removal to have his petition heard*." S. Rep. 95-354, *reprinted in* 1977
     U.S.C.C.A.N. 527 (July 20, 1977) (emphasis added).

**CERTIFICATE OF SERVICE**

I hereby certify that on August 29, 2024, I electronically transmitted the attached Notice of Pending Motions with the Clerk of the Court using the CM/ECF System, which will send notification of filing to all registered parties.

_/s/ B. Wolcott_