**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| State of Arizona, *et al.*, | No. CV-24-02063-PHX-JJT |
| Plaintiff, | **ORDER** |
| v. | |
| Mark Meadows, | |
| Defendant. | |

At issue is Mark Meadows's Notice of Removal (Doc. 1, Notice of Removal), to which the State of Arizona has filed a Response and request to remand (Doc. 7, Response), and in support of which Mr. Meadows filed a Reply (Doc. 8, Reply). The Court also has considered Mr. Meadows's Bench Memorandum Regarding Evidentiary Standard for Removal Hearing (Doc. 9) and the state's Response thereto (Doc. 19). On September 5, 2024, pursuant to 28 U.S.C. § 1455(b)(5), the Court held an evidentiary hearing. (Doc. 13.) For the reasons set forth below in detail, the Court finds that Mr. Meadows fails to present good cause for his untimely filing of his Notice of Removal, and that in any event, an evaluation on the merits yields that he fails to demonstrate that the conduct charged in the state's prosecution relates to his former color of office as Chief of Staff to the President. The Court therefore will remand this matter to the state court.

**I.     Background**

On April 23, 2024, an Arizona grand jury indicted eighteen individuals on nine felony counts pertaining to an alleged attempt to illegally overturn the results of the 2020

presidential election conducted in Arizona. The State contends that, following the election, the eighteen charged individuals participated in an organized "scheme" to "prevent the lawful transfer of the presidency." (Doc. 1-1 at 110–67, Indictment at 13.) According to the State, the actions undertaken by the charged individuals pursuant to this scheme included the commission of various state-law felonies, including one count of conspiracy, one count of fraudulent schemes and artifices, one count of fraudulent schemes and practices, and six counts of forgery. The individuals charged by the State include the eleven individuals who acted as so-called "fake electors" (corresponding to the eleven votes allotted to Arizona in the electoral college), as well as seven individuals who allegedly orchestrated and supported the scheme behind the scenes. (Indictment at 17–21.) Among these behind-the-scenes indictees is Mark Meadows, who served as President Trump's Chief of Staff from 2020–2021 and at all times relevant to this case. In particular, the State alleges that Mr. Meadows "worked with members of the Trump Campaign to coordinate and implement the false Republican electors' votes in Arizona" and "was involved in the many efforts to keep [Trump] in power despite his defeat at the polls." (Indictment at 21.)

Following his indictment and subsequent arraignment, Mr. Meadows removed the state criminal prosecution to federal court pursuant to 28 U.S.C. §§ 1442, 1455. Because the Court did not deem summary remand appropriate, the Court scheduled an evidentiary hearing as required by § 1455(b)(5). Prior to the evidentiary hearing, the State filed a Response opposing jurisdiction and requesting remand to state court. Mr. Meadows filed a Reply, but he also filed a "bench memorandum" on the eve of the evidentiary hearing, to which the State lacked sufficient time to respond in kind. In the interest of fairness, the Court permitted the State to file a supplemental bench memorandum of its own following the evidentiary hearing. Having read the briefs and considered the issues, the Court now addresses the propriety of removal in this case.

II. **Discussion**

The well-pleaded complaint rule typically precludes removal of cases in which federal jurisdiction exists only by virtue of a federal defense. *See Jefferson County v. Acker*,

527 U.S. 423, 430–31 (1999). However, Congress has enacted a limited exception to the general rule. "Under the federal officer removal statute, suits against federal officers may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Id.* The federal officer removal statute is codified at § 1442(a)(1), and it provides in relevant part:

> (a) A civil action or criminal prosecution that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:
> (1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office . . . .

The Supreme Court has explained that, in order to successfully remove a case under § 1442(a)(1), a federal officer must (1) raise a colorable federal defense and (2) establish that the prosecution is for or relating to an act under color of office. *Acker*, 527 U.S. at 431. "To satisfy the latter requirement, the officer must show a nexus, a '"causal connection" between the charged conduct and asserted official authority.'" *Id.* (quoting *Willingham v. Morgan*, 395 U.S. 402, 409 (1969)).

In their briefing, both Mr. Meadows and the State urge the Court to adjudicate this case according to a three-prong test that would require Mr. Meadows to show (1) that he is a federal officer within the meaning of the statute, (2) that there exists a causal nexus between the charged conduct and Mr. Meadows's official duties, and (3) that Mr. Meadows possesses a colorable federal defense. This three-prong test originates in caselaw addressing the propriety of removals by private persons acting under federal officers, in contrast to removals by federal officers themselves. The principal case relied upon by Mr. Meadows makes this clear. *See DeFiore v. SOC LLC*, 85 F.4th 546, 553 (9th Cir. 2023) (holding that "a removing *private entity* must show that '(a) it is a "person" within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a

federal officer's directions, and plaintiff's claims; and (c) it can assert a "colorable federal defense."'" (emphasis added) (quoting *Goncalves ex rel. Goncalves v. Rady Childs. Hosp. San Diego*, 865 F.3d 1237, 1244 (9th Cir. 2017))). Although the distinction between the tests outlined for federal officers versus persons acting under such officers might seem slight, the difference can be material. For instance, the Ninth Circuit recently held that the "under color of such office" requirement is subsumed by the "acting under" and "causal connection" requirements and that satisfaction of the latter two criteria obviates the need to conduct a separate "under color" analysis. *See id.* at 558 n.7. Although it may be sensible to aggregate the "under color" requirement with the "acting under" requirement in cases involving removal by a private entity, it would be a mistake to do so here. First, there is no "acting under" analysis in a case where the removing defendant is himself a federal officer. And second, the Supreme Court's holding in *Acker* clearly treats the "under color" criterion as a standalone requirement, at least insofar as concerns cases in which the removing defendant is himself a federal officer, as was the case in *Acker*. *See* 527 U.S. at 431. *Acker* makes plain that, far from replacing the "under color" requirement, the requisite causal connection between the charged conduct and the asserted federal authority is the *means* by which a court is to assess whether a criminal prosecution is for or relating to an act under color of federal office. Therefore, with respect to cases in which the removing party is a federal officer and not a private entity, the Court does not read the Ninth Circuit's opinion in *Defiore* as rejecting the "under color" component of the analysis.

Nevertheless, the Court sees no issue with using the test urged by the parties here. Although the three-prong test finds its genesis in cases involving removals by private entities, the parties have sufficiently modified the test to comport with the circumstances presented in the case at bar. Despite citing to various Ninth Circuit cases that include an "acting under" component, the parties have omitted any mention of the "acting under" requirement. This is the same approach taken by the Eleventh Circuit in its recent opinion disposing of a case involving facts very similar to those here. Although it cited to a case from the private-entity context, the court excised the "arising under" language and held

that "[s]ection 1442(a)(1) provides a right of removal to federal court if a defendant proves that [1] he is a federal officer, [2] his conduct underlying the suit was performed under color of federal office, and [3] he has a 'colorable' federal defense." *State v. Meadows*, 88 F.4th 1331, 1338 (11th Cir. 2023) (citing *Caver v. Cent. Ala. Elec. Coop.*, 845 F.3d 1135, 1142 (11th Cir. 2017)).

Therefore, in accord with the Eleventh Circuit's opinion, the Court holds that the propriety of Mr. Meadows's removal depends upon his satisfying the three-prong test urged by the parties. In addition to satisfying the substantive dictates of § 1442(a)(1), Mr. Meadows must also demonstrate compliance with the procedural requirements of § 1455, which provides in relevant part that "[a] notice of removal of a criminal prosecution shall be filed not later than 30 days after the arraignment in the State court, or at any time before trial, whichever is earlier, except that for good cause shown the United States district court may enter an order granting the defendant or defendants leave to file the notice at a later time," § 1455(b)(1).

The State presents two main arguments. First, the State contends that Mr. Meadows filed his Notice of Removal after the thirty-day deadline contained in § 1455(b)(1) and that he has failed to show good cause that might permit the Court to excuse the untimeliness. Second, the State argues that Mr. Meadows has failed to meet the second criterion of the substantive three-prong test because the conduct alleged in the indictment does not pertain to Mr. Meadows's role as President Trump's former Chief of Staff. Thus, according to the State, there is no causal nexus between its prosecution and Mr. Meadows's federal authority, thereby precluding a determination that this case is for or relating to any act taken under color of office. The Court addresses each argument in turn.[1]

---

[1] The State also presents, without expanding upon, an argument that Mr. Meadows is not a federal officer within the meaning of § 1442(a)(1) and thus fails the first prong of the three-prong test. At various points throughout its Response, the State notes that the Eleventh Circuit recently held that § 1442(a)(1) applies only to *current* federal officers, not *former* officers, *see Meadows*, 88 F.4th at 1338–43. (Response at 8, 17.) Although the State expressly contemplates that the Court here might align with the Eleventh Circuit and hold that § 1442(a)(1) is inapplicable to Mr. Meadows as a former federal officer, the State does not actually present an analysis of why the Court ought to so find. Accordingly, although the Court does not deem the State to have waived its first-prong argument, the Court elects to resolve this case on the two issues that were substantially briefed, namely whether

### A. Untimeliness

The federal officer removal statute at issue provides in relevant part that

> [a] notice of removal of a criminal prosecution shall be filed not later than 30 days after the arraignment in the State court, or at any time before trial, whichever is earlier, except that for good cause shown the United States district court may enter an order granting the defendant [] leave to file the notice at a later time.

28 U.S.C. § 1455(b)(1). The parties do not dispute Mr. Meadows filed his Notice of Removal 48 days after the arraignment in Arizona state court and that the filing is thus untimely by 18 days under § 1455(b)(1). But Mr. Meadows argues he had good cause to file late, and in effect asks the Court to grant him leave *nunc pro tunc* for his late filing. Mr. Meadows offers three arguments in support of a finding of good cause: 1) he delayed filing the Notice in order to "pursue[] an effort to convince the State that it should not pursue the charges against [him]" (Notice of Removal at 8); 2) he delayed filing while awaiting the United States Supreme Court's decision in *Trump v. United States*, 144 S. Ct. 2312 (2024), which he asserts bears upon his immunity defense in this matter (Notice of Removal at 8); and 3) the Court should interpret the removal statute "broadly in favor of removal" (Reply at 9). These arguments fail to persuade the Court.

While attempting to resolve a matter by mutual assent of the parties to avoid court involvement is both laudable and sensible, parties universally face limitations periods and deadlines in bringing actions, and they do not simply forego meeting those congressional- or court-imposed deadlines to pursue settlement and then beg the mercy of the court if settlement fails to materialize. That is to say, it is a well-trodden path familiar to all counsel to pursue dual tracks in a representation, timely filing an action—or in this case, a notice of removal—to protect their clients' interests[2] while they simultaneously pursue settlement.

---

Mr. Meadows had good cause for his untimeliness under § 1455(b)(1) and whether the charged conduct relates to acts taken under color of office pursuant to § 1442(a)(1).

[2] Indeed, this is precisely what Mr. Meadows did in the Georgia removal matter while represented by the same counsel. In that case, Mr. Meadows filed his notice of removal just two days after arraignment.

Alternatively, parties can and do seek tolling agreements. Here Mr. Meadows did neither, despite one or both options being easily available. Mr. Meadows's first purported reason for failing to timely file his Notice does not present good cause.

Mr. Meadows's second reason for missing the unambiguous deadline set forth in § 1455(b)(1) fares no better. He asserts he waited to file his Notice of Removal because he anticipated the Supreme Court's ruling in *Trump* could bear on his immunity defense, and upon its issuance, he argues, it does so bear. But again, that was no reason to miss the deadline to file his Notice of Removal. Perhaps the Supreme Court's holding in *Trump* does strengthen Mr. Meadow's claim and perhaps it does not—that question will remain until it is taken up in the context of a possible motion to dismiss his case filed in the proper forum. But the ultimate success or failure of Mr. Meadows's federal defense need not have been determined at the time he filed his Notice of Removal—he merely needed to be aware of its existence as colorable. And he was aware of its existence—he in fact contemplated raising immunity before the opinion in *Trump* issued.³ While Mr. Meadows might well want to delay filing any *motion to dismiss* until he has had the opportunity to evaluate *Trump* for its potential impact on his argument of the immunity defense, the filing of that motion is—even now—still well in the future, and there was no need or reason to delay filing *the Notice itself*.

Mr. Meadows does not appear to argue that his late filing was the equivalent of a "second notice" of removal under § 1455(b)(2), nor could he. Although § 1455(b)(2) provides that a defendant may file a second notice of removal "on grounds not existing at the time of the original notice," as the Court notes above, the proffered federal defense of immunity was already extant from the commencement of the state criminal matter. While Mr. Meadows believes *Trump* may strengthen his existing defense, it does not bring new grounds into existence as required for a subsequent notice filing. The text of § 1455(b)(2) also supports the Court's conclusion that the publication of *Trump* does not constitute good

---

³ In response to the Court's direct question at the evidentiary hearing, counsel for Mr. Meadows acknowledged he was not arguing that, but for the issuance of the opinion in *Trump*, he would not have sought removal. (Doc. 20, Tr. 09/05/24 at 145:17-21.)

cause under § 1455(b)(1). If the Court were to countenance Mr. Meadows's untimely filing of his Notice of Removal simply because he suspected that a subsequent opinion might strengthen his position, which is essentially what Mr. Meadows asks the Court to do here, the Court would impermissibly render the second-notice provision of § 1455(b)(2) a nullity. The existence of a filing deadline, in conjunction with an express statutory right to file a second notice of removal "only on grounds not existing at the time of the original notice," indicates to the Court that Mr. Meadows's voluntary delay in this case cannot constitute good cause under § 1455(b)(1). A contrary conclusion would relegate the second-notice provision of § 1455(b)(2) to the status of surplusage whenever a criminal defendant could plausibly claim that a pending case might bear upon his potential removal of the prosecution to federal court.

Finally, in his Reply, Mr. Meadows urges that despite his missing the filing deadline by 18 days, the Court should nonetheless "heed the 'clear command from both Congress and the Supreme Court that when federal officers and their agents are seeking a federal forum, [courts] are to interpret section 1442 broadly in favor of removal.'" (Reply at 9 (quoting *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1252 (9th Cir. 2006)).) And the Court follows that command. But the "broad interpretation" of § 1442 Mr. Meadows notes bears on evaluating the merits of the removal test. It does not mandate, or even counsel, courts to throw out the statute's deadline as set forth in § 1455. In support of his argument, Mr. Meadows cites *Durham v. Lockheed Martin Corp.* That case proves the Court's point. The Ninth Circuit in *Durham* held that the 30-day filing deadline for federal officer removal does not begin to run until the defendant in the state court matter receives disclosure or notice from which he can determine federal officer removability is available. 445 F.3d at 1253. *Durham* does nothing to diminish the operation or effect of the statute's 30-day deadline, and it does not, as Mr. Meadows suggests, teach that where federal officer removal is available, in the name of broad interpretation courts simply should deem any such case as constituting good cause. To do so would negate the 30-day limit altogether,

as every removal notice by a bona fide federal officer would upon filing—no matter its timing—constitute "good cause" for extension.

The Court concludes Mr. Meadows has not shown good cause for leave to untimely file his Notice. But even if good cause had existed, he has failed to demonstrate the offenses charged in the state's prosecution relate to his former color of office as Chief of Staff to the President, as set forth immediately below.

### B. Color of Office

The parties dispute whether the conduct charged by the State relates to acts taken by Mr. Meadows under color of the office of Chief of Staff. A jurisdictional dispute of this nature can take one of two forms: a "facial" attack or a "factual" attack. *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014). A facial attack by the plaintiff accepts the truth of the removing defendant's factual assertions but maintains that they are insufficient to establish federal jurisdiction. *Id.* In contrast, a factual attack contests the validity of the defendant's factual assertions undergirding the notice of removal. *Id.* The standards governing resolution of these two different forms of opposition to removal under § 1442(a)(1) are similar to the standards governing an ordinary objection to subject-matter jurisdiction brought under Federal Rule of Civil Procedure 12(b)(1). *Id.* "Under that framework, where the moving party does not contest the removal notice's factual allegations but instead asserts that those allegations are facially insufficient to invoke federal jurisdiction, we accept the notice's factual allegations as true and draw all reasonable inferences in favor of the remover." *Defiore*, 85 F.4th at 552. When the plaintiff's "motion to remand raises a factual challenge by contesting the truth of the remover's factual allegations, usually by introducing evidence outside the pleadings, however, the remover must support her jurisdictional allegations with competent proof under the same evidentiary standard that governs in the summary judgment context." *Id.* at 552–53 (cleaned up) (internal quotation marks omitted). Thus, in a factual dispute, "[t]he remover 'bears the burden of proving by a preponderance of the evidence that each of the requirements for subject-matter jurisdiction has been met.'" *Id.* at 553 (quoting *Leite*, 749 F.3d at 1121). The district court

resolves such factual disputes from the bench, except when the dispute is intertwined with the merits of the case. *See id.*

At the evidentiary hearing, the Court asked both parties' counsel whether this case presents a facial or a factual dispute. The State answered that it has raised a factual dispute to Mr. Meadows's Notice of Removal, but Mr. Meadows disagreed and instead asserted that the disagreement here is facial in nature. The Court agrees with the State on this point.

In its indictment, the State alleges that Mr. Meadows communicated with several Republican operatives both inside and outside Arizona in furtherance of the "scheme" to overturn the results of the 2020 election. Mr. Meadows incorporates these facts in his Notice of Removal. Indeed, rather than make any additional or alternative factual assertions to support his invocation of federal jurisdiction, Mr. Meadows simply quotes the State's indictment verbatim. (Notice of Removal at 4–6.) In particular, Mr. Meadows quotes the State's allegations that: Mr. Meadows "confided" to a White House staff member that Trump had lost the election but that Mr. Meadows nevertheless wanted to continue "fighting the election results" in order to "pull this off" for Trump; that Mr. Meadows received texts from Kelli Ward (the chair of the Arizona Republican party and one of the alleged "fake electors") indicating that Ward felt that the Trump campaign's lawyers in Arizona were "afraid of being blackballed by the left" and were engaging in "a total cop out"; that Rudy Giuliani, Ward and others contacted Mr. Meadows regarding overtures they had made to the Maricopa County Board of Supervisors, including one such call from President Trump to Clint Hickman, the chairman of the board of supervisors; and that the Secretary of Energy, President Trump's son, an Arizona Congressional representative, and several others contacted Mr. Meadows with an "aggressive strategy" involving various Republican-controlled state legislatures rejecting their states' votes and instead opting to send their own slate of electors to the electoral college, to which Mr. Meadows responded "I love it." (Notice of Removal at 4–6.)

In its Response and at the evidentiary hearing, the State introduced additional evidence relating to the prosecution that:[4] Mr. Meadows messaged an individual in Georgia instructing him to explain to a second individual how the Republican elector strategy was to unfold; that, after receiving complaints from Ward that their attorneys were freezing her out, Mr. Meadows responded that he "will push them," which he promptly did; that Matt Schlapp (a lobbyist and chairman of the American Conservative Union) contacted Mr. Meadows requesting an allocation of campaign funding to Nevada, a leader on the ground, and twenty people to undertake the on-the-ground work, to which Mr. Meadows responded "[m]oney has been allocated for Nevada. Tell me what you need. Just spoke to Ronna [the chair of the Republican National Committee]"; that Mr. Meadows procured Governor Ducey's phone number so that Giuliani could reach him "about the election results in Arizona"; that Mr. Meadows wrote to a senior Trump campaign official that "[w]e just need to have someone coordinating the electors for states"; that Mr. Meadows, in response to a text from Senator Mike Lee regarding the alleged fake-elector scheme, responded "I am working on that as of yesterday"; that Mr. Meadows, in response to a suggestion that Trump electors meet at state capitols to cast their votes, responded "[w]e are"; and that Mr. Meadows texted Congressman Jim Jordan regarding the plan to have Vice President Pence embrace the fake electors, "I have pushed for this. Not sure it is going to happen." (Response at 13–14; Doc. 15.)

Not only has Mr. Meadows not disputed any of the foregoing facts, but he has necessarily relied upon them. Were it otherwise, Mr. Meadows's Notice of Removal would not contain any factual allegations supporting federal jurisdiction. Mr. Meadows asserts that the State's facts satisfy the jurisdictional requirements of § 1442(a)(1) because the

---

[4] Mr. Meadows asserts that the State is impermissibly "sand-bag[ging]" him by introducing factual allegations outside the indictment in order to illuminate the nature of its prosecution. (Reply at 6.) Notably, however, Mr. Meadows does not dispute these factual allegations, nor does he offer contradictory factual allegations. In any event, parties in a jurisdictional dispute such as this are permitted to "introduce[] evidence outside the pleadings." *See Defiore*, 85 F.4th at 552–53. Indeed, it would be odd for § 1455(b)(5) to require an evidentiary hearing—a hearing which Mr. Meadows expressly requested, (Notice of Removal at 3, 8–11)—if contemplation of evidence outside the indictment constituted sandbagging.

facts alleged by the State consist of, or at least relate to, acts taken under color of Mr. Meadows's federal office. In other words, this is not a case in which opposing parties offer competing facts; rather, it is a case in which the parties offer competing *characterizations* of identical facts. Thus, for the limited purpose of this jurisdictional adjudication, the State and Mr. Meadows do not disagree as to *what* occurred, but instead disagree as to *whether* what occurred pertained to Mr. Meadows's official duties as Chief of Staff. The dispute, therefore, turns upon the scope of a Chief of Staff's official authority and whether the charged conduct arguably falls within that scope of authority. In the Ninth Circuit, "the scope and content of a [public employee's] job responsibilities is a question of fact." *Dahlia v. Rodriguez*, 735 F.3d 1060, 1073 n.12 (9th Cir. 2013) (en banc) (quoting *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1130 (9th Cir. 2008)) (noting the existence of a circuit split on the issue of whether the scope of official duties presents a question of fact or law).[5] Therefore, because the contours of a Chief of Staff's "color of office" presents a question of fact, the Court concludes that the State's opposition to removal jurisdiction in this case constitutes a factual attack. Accordingly, Mr. Meadows, as the removing party, bears the burden of proving by a preponderance of the evidence that each of the jurisdictional requirements have been met. *See Defiore*, 85 F.4th at 553. However, the Court's placement of the burden of proof is immaterial because Mr. Meadows would not prevail under any standard.

Mr. Meadows frames the Chief of Staff's role as essentially the gatekeeper who controls access to the President, the "filter for the President's time and attention," (Notice of Removal at 2), and the key official in charge of "facilitating communication to and from the President," (Reply at 3–4). Although Mr. Meadows has adduced no evidence beyond his own say-so supporting his description of the Chief of Staff's official authority, the State

---

[5] In concluding that the scope and content of a public employee's job responsibilities is a question of fact, *Dahlia* and related cases examined the issue in the context of § 1983 First Amendment retaliation claims brought by public employees against their employers. *See* 735 F.3d at 1063, 1072. Although that scenario is distinct from the factual situation here, the Court finds the circumstances to be sufficiently analogous such that the holding in *Dahlia* is persuasive, particularly in light of the apparent dearth of positive law defining the role of a President's Chief of Staff.

has not offered a competing construction. Therefore, the Court credits Mr. Meadows's assertion regarding the Chief of Staff's scope of office. However, this conclusion is unavailing to Mr. Meadows because his vision of the Chief of Staff's color of office does not correspond to the facts of this case. In arguing that the charged conduct falls under color of his former federal office, Mr. Meadows contends that the State has done no more than allege that he "received (and occasionally responded to) messages from people who were trying to get ideas in front of President Trump or seeking to inform Mr. Meadows about the strategy and status of various legal efforts by the President's campaign." (Notice of Removal at 2.) Mr. Meadows asserts that "[t]he senders were seeking to get their message to the President through Mr. Meadows, to persuade the President's closest senior advisor, or simply to keep Mr. Meadows apprised of what was happening." (Notice of Removal at 7.) And, according to Mr. Meadows, "fielding that sort of incoming [sic] from people who want the President's attention or to influence his decision-making is squarely within the Chief of Staff's responsibilities." (Notice of Removal at 7.) Thus, Mr. Meadows's core contention, and the object of the State's jurisdictional attack, is "that his charged conduct—essentially, facilitating communication to and from the President related to the 2020 Election—was within the scope of his official duties." (Reply at 3–4.)

Mr. Meadows has not so much removed the State's indictment as rewritten it. Contrary to Mr. Meadows's assertions, the State has not indicted Mr. Meadows for merely facilitating communication to and from the President or for simply staying abreast of campaign goings-on. Instead, the State has indicted Mr. Meadows for allegedly *orchestrating* and *participating* in an illegal electioneering scheme. Few, if any, of the State's factual allegations even resemble the secretarial duties that Mr. Meadows maintains are the subject of the indictment. None of the factual allegations at issue here mention management of the President's time or facilitation of communication to and from the President, much less that any such time management or communication facilitation constitutes the charged conduct in this case. Similarly, contrary to Mr. Meadows's reframing of the indictment, he is not being prosecuted for receiving text messages

intended to simply keep him "apprised of what was happening" with the Trump campaign. As already noted, the indictment has charged Mr. Meadows with "coordinat[ing] and implement[ing] the false Republican electors' votes in Arizona," not merely staying informed of the alleged scheme. (Indictment at 21.) To allow Mr. Meadows to recharacterize the State's indictment at the level of generality that he seeks to do would be to vitiate both the federal officer removal statute and the Supreme Court precedent interpreting that statute, as *every* criminal prosecution of a federal officer will in some vague sense involve that officer's staying "apprised of what is happening." Federal jurisdiction cannot turn upon amorphous generalities that will be present in all instances. Moreover, regardless of the extent to which any individual factual allegation might tenuously relate to Mr. Meadows's official duty to facilitate communication to and from the President, the Court agrees with the Eleventh Circuit's conclusion that "an accused's removal theory must accord with a claim—a *criminal charge*—brought against him." *Meadows*, 88 F.4th at 1344. Therefore, it is the "heart of the indictment" that matters. *Id.* "To allow Meadows to remove the action if any single allegation in the indictment related to his official duties would run contrary to both the removal statute and precedent." *Id.* at 1345.

Thus, Mr. Meadows's legal contention that Supreme Court caselaw requires this Court to "credit [Mr. Meadows's] theory of the case" rings hollow. (*See* Reply at 4 (quoting *Acker*, 527 U.S. at 432).) The Court rejects removal here not because there is a problem with Mr. Meadows's "theory of the case," but instead because there is a fundamental misalignment between Mr. Meadows's legal theory and the facts undergirding the State's prosecution.[6] In past cases, the Supreme Court has upheld removal where "the federal officer's 'relationship to [the plaintiff] derived solely from their official duties.'" *See Osborn v. Haley*, 549 U.S. 225, 249 (2007) (quoting *Willingham v. Morgan*, 395 U.S. 402,

---

[6] To be clear, in apparent contrast to his argument before the Eleventh Circuit, Mr. Meadows does not contend that the Chief of Staff bears any responsibility for the supervision of state elections. *Cf. Meadows*, 88 F.4th at 1346. The Court therefore does not address the Elections Clause, the Take Care clause, or any other source of potential state-election authority for federal officers.

409 (1969)). Here, however, the State's charged conduct is unrelated to Mr. Meadows's official duties. Although the Court credits Mr. Meadows's theory that the Chief of Staff is responsible for acting as the President's gatekeeper, that conclusion does not create a causal nexus between Mr. Meadows's official authority and the charged conduct.[7] Therefore, because the Court concludes that the conduct charged in the State's prosecution does not relate to Mr. Meadows's color of former office, the Court must remand this case to state court for want of subject-matter jurisdiction.

For the reasons set forth above,

**IT IS ORDERED** declining to assume jurisdiction over the State of Arizona's criminal prosecution of Mr. Meadows under 28 U.S.C. §§ 1442 and 1455.

**IT IS FURTHER ORDERED** discharging the Notice of Removal (Doc. 1) and remanding this matter to the Superior Court of Arizona in and for Maricopa County.

**IT IS FURTHER ORDERED** directing the Clerk of Court to terminate this matter.

Dated this 16th day of September, 2024.

_____
Honorable John J. Tuchi
United States District Judge

---

[7] One minor contention in Mr. Meadows's Reply is emblematic of this point. Mr. Meadows asserts that Special Counsel Jack Smith alleged in a separate case that "Mr. Meadows participated because, as 'Chief of Staff, . . . [he] sometimes handled private and Campaign-related logistics for [the President].'" (Reply at 5 (quoting Superseding Indictment at 13 ¶ 33, *United States v. Trump*, (No. 23-cr-257 ECF No. 226)).) That representation, made by way of artful alteration of the Special Counsel's wording, is not accurate. The Special Counsel did not allege that Mr. Meadows handled private or campaign-related affairs *as Chief of Staff*. Instead, the Special Counsel simply noted that "the Defendant [President Trump], his Chief of Staff—who sometimes handled private and Campaign-related logistics for the Defendant—and private attorneys . . . called the Secretary of State." Superseding Indictment at 13 ¶ 33. In other words, the Special Counsel merely alleged that Mr. Meadows, who happened to occupy the office of Chief of Staff, undertook certain private actions. The Special Counsel did not insinuate that all actions taken by Mr. Meadows during his tenure as Chief of Staff are *ipso facto* official actions under color of office.